919 F.2d 665
 RICO Bus.Disp.Guide 7655
 Ivory WRIGHT, Mary Lee Wright, Eloise Yon, Otis Evans,
Plaintiffs-Appellants,
v.
Joseph SHEPPARD, Individually and in his capacity as Sheriff
of Highlands County, Florida, Crobmond (Foots) Livingston,
individually and in his capacity as Deputy Sheriff of
Highlands County, Florida and Albert Lee Williams,
Defendants-Appellees.
 No. 89-5700.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 18, 1990.
 
 Michael Guare, Florida Rural Legal Services, Inc., Bartow, Fla., James K. Green, West Palm Beach, Fla., Miyoshi D. Smith, Lipman & Weisberg, Miami, Fla., Terry E. Allbritton, M. David Gelfand, Appellate Advocacy Program, New Orleans, La., for plaintiffs-appellants.
 Julius F. Parker, Jr., Tallahassee, Fla., T.J. Cunningham, Cunningham & Cunningham, Brown & Weaver, West Palm Beach, Fla., for defendants-appellees.
 Peter M. Siegel, Randall C. Berg, Jr., Executive Director, Florida Justice Inst., Inc., Miami, Fla., for amicus curiae Florida Justice Institute.
 Appeal from the United States District Court for the Southern District of Florida.
 Before FAY and COX, Circuit Judges, and GODBOLD, Senior Circuit Judge.
 GODBOLD, Senior Circuit Judge:
 
 
 1
 Plaintiff Ivory Wright and others sued law enforcement officers of Highlands County, Florida, seeking monetary, injunctive, and declaratory relief for alleged deprivation of their rights arising from the actions of county law enforcement officers who allegedly served as enforcers for private creditors to whom plaintiffs were indebted. The suit was brought under 42 U.S.C. Sec. 1983, the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. Secs. 1961 et seq.), and Florida RICO (Fla.Stat. Secs. 895.01 et seq.). At trial the plaintiffs' claims focused primarily on two defendants, Highlands County Sheriff Joseph Sheppard, now deceased, and Deputy Sheriff Crobmond ("Foots") Livingston, and particularly on actions of Livingston directed against debtors of Albert Williams, a grocer and moneylender in Avon Park, located in Highlands County.
 
 
 2
 Williams was also named as defendant, but that claim was dismissed for want of prosecution. After a bench trial, the district judge, on February 12, 1988, entered partial findings of fact and conclusions of law orally from the bench. Ten months later, on December 5, 1989, the court entered additional findings and conclusions in writing in a "final order on liability." By the oral findings and the written order on liability the court found against all plaintiffs except Wright.[1] The court found that Sheriff Sheppard was not liable in either his personal or official capacity as to any claims against him. As to Wright's claims against Livingston, the court found that Livingston struck Wright, causing him personal injury that constituted a battery and entitled Wright to damages for his injuries. It found that Livingston falsely imprisoned Wright by transporting him to Williams' home against his will, by force or under a reasonable apprehension of force. In the December 5 order the court reserved ruling on compensatory damages and directed counsel to file "proofs of past and anticipated future medical expenses and other damages as specified in this Order." It held, however, that Wright was not entitled to punitive damages against Livingston. Thereafter Wright filed an affidavit with attachments.
 
 
 3
 On June 3, 1989 the court entered a final order, which stated that the matter was before the court on damages; it awarded Wright damages of $569 against Livingston on the battery claim for physical injuries consisting of the loss of two teeth. No award was made to Wright for false imprisonment. We set out in the margin the full text of the order covering damages.[2]
 
 
 4
 As to the plaintiffs other than Wright, we affirm the district court's judgment in favor of the defendants. We affirm the court's rulings against Wright on his RICO claims and on his Sec. 1983 claims against Sheriff Sheppard. We vacate the district court's award of damages, however, and remand for reconsideration of damage issues.I. The facts
 
 
 5
 The district court's findings reveal the following: At the time of the events giving rise to this action Wright was a man of about 58 years, of slight build and weighing about 140 pounds. He had a drinking problem. Livingston was a large man, some 6' 2" tall and weighing about 240 pounds. He had been a deputy in the Highlands County Sheriff's Department for about 28 years. In the Avon Park neighborhood, as the district court put it, "he has been 'the man', he has been law enforcement in that community for many years." On the night of October 2, 1983 Livingston, in uniform and in his patrol car, came to Wright's home in Avon Park. He ordered Wright into the patrol car and took him, against his will and under the threat of force, to Williams' home to discuss a debt Wright allegedly owed Williams. At some point in the evening Livingston struck Wright in the face with his hand, knocking out two of Wright's teeth and, in the language of the district court, "causing other bodily injury," but this other injury was never described by the court. Livingston eventually took Wright back to his home.[3]
 
 
 6
 Later in the night of October 2, the Avon Park Police Department received an ambulance call. The ambulance picked up Wright and, on the way to the hospital, Wright told the ambulance personnel that he had been beaten by Livingston. A psychologist, who interviewed Wright at a later time, stated in his report that Wright was seen in the hospital emergency room but not admitted to the hospital. The Police Department contacted the Sheriff's Department, which began an investigation on October 4. Livingston resigned from the Sheriff's Department later in 1983.
 
 
 7
 The facts relating to Wright's physical and emotional injuries are complicated by a stroke suffered by Wright between the times of the battery and of trial. The record contains no evidence relating to any causal connection between Livingston's blow and the stroke. At trial the plaintiff offered no evidence, other than his own testimony, of physical injury or of past or anticipated medical expense arising from the battery. In response to the court's post-trial order directing plaintiff to file proof of damages, plaintiff filed his own affidavit asserting that the hospital bill for emergency treatment on the night of the incident was approximately $300, although he did not say that he had paid it nor did he submit other evidence supporting this amount. The affidavit stated that as a result of being beaten by Livingston Wright could no longer work at his former employment of picking oranges. He described residual difficulty with his right arm and pain in his mouth. In the affidavit he claimed that because of the beating he had lost his house, lost his job, and lost his wife, who feared that Livingston might return and attack him again. Also he described various emotional difficulties.
 
 
 8
 Wright attached to his affidavit the evaluation of the psychologist mentioned above, who based his opinion of Wright's emotional problems on a single examination and interview. The psychologist referred to the possibility of Wright's needing semi-skilled or possibly skilled nursing services for the rest of his life. But he noted that he had not seen any hospital records and that a much longer evaluation would be necessary to get a more complete picture of Wright's psychological state, intellectual functioning, and emotional life. The psychologist did not relate Wright's psychological condition to his being struck by Livingston. Nor was the psychologist able to determine whether the stroke and the assault were related. Plaintiff also attached a dentist's bill in the amount of $569 covering two extractions, one filling, one cleaning, and one upper partial denture. The dentist noted a "good chance" that further fillings would be necessary, as well as a possibility that Wright could lose additional teeth from his injuries.
 
 
 9
 After receiving the post-trial material the court entered the order on damages appearing as note 2.II. Livingston's liability for damages
 
 
 10
 The judgment finding Livingston liable for battery and false imprisonment, and liable under Sec. 1983, is sound. This case must be remanded to the district court, however, for further consideration of damages. The problems are several.
 
 
 11
 Damages under Sec. 1983 are determined by compensation principles brought over from the common law. Carey v. Piphus, 435 U.S. 247, 254-55, 98 S.Ct. 1042, 1047-48, 55 L.Ed.2d 252 (1977). The adaptation of common law rules to provide fair compensation for injuries caused by the deprivation of a constitutional right is of some delicacy at times, id. at 258, 98 S.Ct. at 1049. However, "the focus of any award of damages under Sec. 1983 is to compensate for the actual injuries caused by the particular constitutional deprivation. The amount of damages to be awarded should be grounded in a determination of the plaintiff's actual losses." Gilmere v. City of Atlanta, 864 F.2d 734, 739 (11th Cir.) (citing Memphis Community School Dist. v. Stachura, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)), cert. denied, --- U.S. ----, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989). With respect to Wright's physical injury, it is not arguable that fair compensation for injury that consisted of losing two teeth is not limited to the treating dentist's bill. Having teeth has value, just as does having an arm, a leg or an eye, and loss of teeth is a subject for compensatory damages just as is loss of arm, eye, or leg.
 
 
 12
 The order on damages accepts the dentist's bill in one sentence, and that acceptance of the amount of the bill as an item of damages is not questioned. The rest of the order on damages appears to relate to only the claim of a post-incident stroke. The court did not err in rejecting this claim. There was no evidence of Wright's physical health prior to the blow by Livingston other than testimony that he had a drinking problem and may have been an alcoholic. The proximity of the alleged stroke to the battery was unrevealed, and plaintiff failed to prove a causal relationship between Livingston's blow and the stroke.
 
 
 13
 But beyond the physical damage consisting of loss of teeth and the rejected claim relating to the alleged stroke, the district court did not address evidence of other types of compensable damages that Wright claims to have suffered. Some of this evidence relates to additional physical injuries and consequences of physical injury; other evidence relates to non-physical injuries such as humiliation, emotional distress, mental anguish and suffering that, if found to be present, are within the ambit of compensatory damages. Wright obviously suffered pain incident to losing two teeth, a consequence that is self-evident and is not covered by the dentist's bill; also, he testified to continued pain in his mouth, which he claims affects his ability to work. Wright asserted that the use of his right arm was limited from the encounter with Livingston and that from this injury and from physical pain he could no longer carry out his previous work of orange picking. He described nightmares of Livingston's returning and beating him and of crying when people talked to him abut the incident. He claimed that he had lost his house, lost his job, and lost his wife, who feared that Livingston might return and attack him again.
 
 
 14
 With respect to false imprisonment, Wright as a matter of law is entitled to compensatory damages. At common law the fact of an illegal restraint entitles the victim to at least nominal damages. Anderson v. Robinson, 497 F.2d 120, 121 (5th Cir.1974). Mental suffering is also a proper compensable element for false imprisonment, including disgrace, humiliation or a feeling of degradation or inferiority, injury to the feelings, fright, and embarrassment. E.g., Reicheneder v. Skaggs Drug Center, 421 F.2d 307, 312-13 (5th Cir.1970); 24 Fla.Jur.2d False Imprisonment and Malicious Prosecution Sec. 10 at 543-44 (1981).
 
 
 15
 Thus, the district court must revisit the subject of injuries claimed and testified to by Wright and address the matter of compensatory damages for false imprisonment.
 
 
 16
 Also, the district court erred in denying punitive damages against Livingston. With respect to punitive damages the court held:
 
 
 17
 In the instant case the Court finds that punitive damages are not warranted. WRIGHT has not shown that the acts complained of--the battery and false imprisonment committed by LIVINGSTON against WRIGHT--were so wanton, malicious, or reckless as would justify imposition of punitive damages. The preponderance of the evidence was that LIVINGSTON's conduct was not prompted by bad motives such as malice or desire for personal gain but rather flowed form LIVINGSTON's perception, albeit erroneous, that LIVINGSTON was doing his job. Punitive damages are not justified in this case.
 
 
 18
 Rec. 2, final order on liability, p. 8. Earlier the court had found that Livingston had helped at least three creditors, including Williams, collect debts from citizens of Avon Park. But the court found no evidence that, in so doing, Livingston was motivated by malice or any desire for personal gain, and that he did not benefit financially or otherwise from assisting Williams but rather believed that such assistance was part of his job as deputy--"one aspect of keeping the peace in Avon Park."
 
 
 19
 These findings are a journey down the wrong road. Livingston was found liable for assault and false imprisonment. He was not found liable for helping Williams collect from those who owed him or for bringing civil debtors and creditors together through his official position. In focusing on Livingston's so-called perception about his role as peacemaker in the community the court reached conclusions that were inconsistent with the facts relevant to the wrongs that Livingston was found to have committed. Unquestionably Livingston intended to do what he did when he struck and imprisoned Wright. No evidence supports a conclusion that in committing these wrongs he was acting as peacekeeper; indeed, the court rejected all such testimony. Williams did not assert at trial that he beat Wright in pursuit of a peacekeeping role. Rather he denied striking Wright at all. He did claim a peacemaking role for the false imprisonment. He testified that he was directed by the dispatcher of the Sheriff's Department to take Wright to see Williams, that he went by Wright's house and told him Williams wanted to see him and inquired whether Wright wished to go, and that Wright accompanied him voluntarily at the suggestion of his wife. The court rejected all of this testimony--Livingston's denial that any blow was struck, the asserted dispatch by the sheriff's office, and the claim that Wright went voluntarily. In short, under the facts as found, the court rejected any peacekeeping mission for the assault and the false imprisonment. That Livingston may have thought of himself on other occasions, or in general, as a community peacemaker did not address his wrongs--wrongs he denied committing--in beating and falsely imprisoning a debtor who had violated no law, engaged in no wrongful conduct, and committed no act of provocation.
 
 
 20
 Punitive damages are appropriate under Sec. 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). See also H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1089 (11th Cir.1986). Livingston did act with callous or reckless indifference to Wright's federally protected rights. This case cries out for punitive damages as punishment. The wrongs were especially offensive in their nature. The wrongs did not involve excessive force in the heat of breaking up a fight or making an arrest. Livingston, a large and powerful man, out on an undertaking of his own, during the nighttime, and behind the screen of official uniform and police car, carried out an intentional invasion of the home of a small and weak man. In night rider fashion, he hauled Wright away by force or fear. He either struck Wright in his wife's presence or returned him to her with his teeth knocked out.
 
 
 21
 Punitive damages will deter as well. Livingston has left the Highlands County Sheriff's Department. If he is now engaged or hopes to again engage in law enforcement work, punitive damages will tend to deter him from abusing innocent persons. The possibility of punitive damages will say to law enforcement officers in general that their responsibilities as keepers of the peace are not a license to violate the federally protected rights of the citizens they serve.
 
 
 22
 We direct that on remand punitive damages must be awarded.
 
 
 23
 A plaintiff is not entitled to punitive damages as a matter of right. No matter how egregious the defendant's conduct, whether to award punitives is left to the factfinder. A decision by the trial judge, sitting in a bench trial, to deny punitives is, however, reviewable for exercise of discretion in the same manner as innumerable other trial acts of judges. Indeed, the authority of a court of appeals to review district court findings concerning punitive damages has been recognized in a number of contexts. In cases in which punitive damages were denied by the district court, this court and its predecessor have reversed and directed the award of punitive damages. In Gore v. Turner, 563 F.2d 159 (5th Cir.1977), a decision binding on this court, defendant discriminated against a black plaintiff by refusing to rent to her because of her race. The district court awarded nominal compensatory damages and denied punitive damages. On appeal the Fifth Circuit directed punitive damages "because of the seriousness of the defendant's conduct" and "to deter the defendant from such conduct in the future." The court applied what it termed the "general rule":
 
 
 24
 The general rule is that punitive damages may be imposed only if the defendant has acted willfully and with gross disregard for the plaintiff's rights. The award of punitive damages 'involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent' to future illegal conduct. Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (5th Cir.1970).
 
 
 25
 Id. at 164. Undergirding the "seriousness" conclusion were detailed facts describing defendant's conduct. Defendant took plaintiff's deposit on an apartment and told her it would take 24 hours to check her credit. The credit check never materialized despite several inquiries by plaintiff, and 10 days later she withdrew her deposit. She wanted to reapply when the credit investigation was completed, but she never heard from defendant. As a consequence of defendant's conduct plaintiff had to move into a vacant and vandalized house. The defendant had misled and made false statements to other black applicants. To obtain government loans defendant had signed an agreement that he would not discriminate on the basis of race. During pendency of the appeal defendant had engaged in racial steering. The court reviewed defendant's discriminatory conduct toward plaintiff and others similarly situated and found it to be sufficiently serious to call for punitive damages and, exercising its judgment, also concluded that punitive damages would deter the defendant from similar conduct in the future.
 
 
 26
 In H.C. by Hewett v. Jarrard, 786 F.2d 1080 (11th Cir.1986), the court's methodology was the same. The district court had awarded nominal compensatory damages but no punitives, finding that defendant's conduct "was not so egregious nor did it exhibit maliciousness or ill will so as to warrant punitive damages." On appeal this court applied the Smith v. Wade standard. We concluded that defendant's actions "transcended mere negligence and constituted callous indifference to [the victim's] federally guaranteed rights." We reached this conclusion after examining defendant's conduct, which included the use of unreasonable force on the victim, a detainee in a juvenile institution; denial of medical attention to the victim for an injury inflicted on him by the superintendent; shackling of the nonviolent victim to his bunk (legs cuffed to one end of the bunk, wrists cuffed over his head to the other end); and no notice of charges or hearing. Thus, this court considered the gravity of the wrongs, provocation by the victim, the violations of due process, and our own conclusion that there had been a series of acts intended to punish the victim rather than to maintain discipline.
 
 
 27
 Courts of appeal have reviewed and reduced a factfinder's award of punitive damages. See Rowlett v. Anheuser-Busch, 832 F.2d 194, 206 (1st Cir.1987) (Sec. 1981 case); Ustrak v. Fairman, 781 F.2d 573, 578 (7th Cir.1986) (Sec. 1983 case). The court in Rowlett reviewed the evidence and reduced the jury's award of $3,000,000 to $300,000. The court in Ustrak found the jury's award of $15,000 in a prisoner case to be "grossly excessive" and reduced the award to $1,000. One of the hottest legal controversies in our country today concerns allegedly excessive punitive damage awards; it necessarily implicates the power of appellate courts to review decisions of factfinders concerning punitives. There would be no power to reduce awards for excessiveness if the factfinder's word were final.
 
 
 28
 The cases are legion in which an appellate court has reviewed and affirmed the district court's denial of punitive damages as within the court's discretion. See e.g. McCann v. Coughlin, 698 F.2d 112, 127 (2d Cir.1983) (Sec. 1983 case); West Des Moines State Bank v. Hawkeye Bancorp., 722 F.2d 411, 414 (8th Cir.1983) (applying Iowa law); Al-Zawkari v. American S.S. Co., 871 F.2d 585, 590 n. 8 (6th Cir.1989).[4]
 
 
 29
 The power of trial judges to order remittiturs where awards of punitives are considered excessive is unquestionable. They would possess no such power if the decision of the factfinder were sacrosanct.
 
 
 30
 These cases we have discussed are not inconsistent with Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). In Smith v. Wade plaintiff, a juvenile first offender, was awarded punitive damages in a Sec. 1983 action pursuant to the following jury instruction:
 
 
 31
 In addition to actual damages, the law permits the jury, under certain circumstances, to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary misconduct, and to serve as an example of warning to others not to engage in such conduct.
 
 
 32
 If you find the issues in favor of the plaintiff, and if the conduct of one or more of the defendants is shown to be a reckless or callous disregard of, or indifference to, the rights or safety of others, then you may assess punitive or exemplary damages in addition to any award of actual damages.
 
 
 33
 ... The amount of punitive or exemplary damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and to deter him and others from like conduct.
 
 
 34
 461 U.S. at 33, 103 S.Ct. at 1628 (emphasis in original). Defendant contended that punitive damages could not be awarded on a finding of reckless or callous disregard or of indifference to plaintiff's rights or safety and that actual malicious intent was required, which, he asserted, is always the proper standard for punitive damages in a Sec. 1983 case. Second, he urged that even if actual intent is not always required it should have been required in the particular case. The court rejected defendant's contentions. The court noted that punitive damages are not available as a matter of right but rather, no matter how egregious the defendant's conduct, whether to award punitives is left for the jury, which may or may not make such an award. Id. at 52, 103 S.Ct. at 1638. Thus, as the instruction itself said, the jury is permitted to award punitives when the Wade standard of conduct has been violated.
 
 
 35
 Wade is a jury instruction case. It addresses the corectness of an instruction telling the jury what it may do. Similarly, Wade speaks to what a judge as factfinder may do. It does not address the issue of this case, which concerns the reviewability by appeal of the action of the judge as factfinder when, in the exercise of his discretion (i.e., what he "may do") he declines to award punitive damages, and it neither says nor implies that a judge's decision to deny punitives is unreviewable. This court may review the judge's improper exercise of discretion as it reviews innumerable other discretionary acts of trial judges. Once plaintiff has established that he qualifies for punitive damages, he is entitled to consideration by a judge as factfinder that is within the proper bounds of the judge's discretion and that is reviewable for improper exercise of that discretion. The facts, as found by the district court in this case and relating to the offenses that Livingston was found to have committed, qualify Wright for punitive damages. But in a finding inconsistent with those facts the district court denied punitive damages. If that error were uncorrectable on appeal, Gore and H.C. and the many other types of cases we have described would be wrong. And the legion of cases in which courts of appeals have reviewed and affirmed denials of punitives as within the trial court's discretion, would be exercises in futility, each an erroneous exercise of power but harmless.
 
 III. RICO
 
 36
 The district court did not err in finding Livingston not liable under federal or state RICO. The only incident that plaintiff Wright proved was that of October 2. Wright thus failed to establish a pattern of racketeering activity. See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3284 n. 14, 87 L.Ed.2d 346 (1985).
 
 
 37
 Wright contends that under the "collection of unlawful debt" prong of the federal statute, 18 U.S.C. Secs. 1961(6), 1962(c), and the Florida statute, Sec. 895.02(2) (Supp.1990), he was not required to prove a pattern. Wright relies on Durante Bros. and Sons, Inc. v. Flushing National Bank, 755 F.2d 239 (2d Cir.), cert. denied, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985). It is doubtful that, even under a generous reading of the amended complaint, the plaintiff actually raised and tried the "collection of unlawful debt" theory under federal or state RICO. Assuming he did, Livingston was nevertheless not liable, given the district court's findings that the plaintiff proved only a single, isolated transaction and that Livingston enjoyed no financial gain from his activities. See Durante Bros., 755 F.2d at 250 (scope of RICO does not extend to "occasional usurious transactions by one not in the business of loan sharking").
 
 IV. Liability of Sheriff Sheppard[5]
 
 38
 If an officer departs from the role of neutral law enforcement officer by attempting to enforce a private debt collection, and engages in conduct that effectively intimidates an alleged debtor into refraining from exercising her legal rights, then the officer exceeds constitutional limits on his authority. See Booker v. City of Atlanta, 776 F.2d 272 (11th Cir.1985) (per curiam). Wright contends that Sheriff Sheppard is liable in both his personal and official capacities for such a violation by Livingston. With respect to personal liability, the district court concluded that Sheppard did not personally participate in any debt collection matters and that he had established no policy or custom specifically regarding assistance in debt matters. The court found no affirmative or causal connection between Livingston's actions and some action or inaction on the part of the sheriff. See Gilmere v. City of Atlanta, 774 F.2d 1495, 1504 (11th Cir.1985) (en banc), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).
 
 
 39
 Sheriff Sheppard testified, and the district court accepted, that he had heard of some situations in which officers "assisted business persons" in order to prevent civil actions from taking place, for the purpose of keeping the peace and saving the taxpayers' money. The court found that although the sheriff knew that deputies sometimes responded to calls that turned out to be debt collection disputes, and sometimes attempted to get disputants to "work things out," he did not know that Livingston or any other deputy collected debts for Williams or any other creditor. These findings are not plainly erroneous.
 
 
 40
 Approximately a month before the October 2 incident Wright came to the Sheriff's Department, talked to the sheriff's secretary, and told her that Livingston had harassed him regarding a debt owed Williams. The secretary made a note of the complaint, addressed to "Chief." Sheppard testified that this title referred to the chief deputy, not the sheriff. In his testimony Sheppard remembered the secretary's telling him about a citizen's complaint concerning Livingston, and he thought he recalled that Wright was the citizen involved. But he did not recall the nature of the complaint. He described Wright's reputation as that of an alcoholic and of a person not of high standards. Sheppard was uncertain whether he ever saw the secretary's note, although he acknowledged that he might have. He thought that if the note did come to his attention, it was assigned to a subordinate for investigation. The court concluded that the note did not constitute notice that Livingston had threatened Wright or that he collected debts for Williams, that at most the note was notice that Wright (who evidenced to the secretary a drinking problem) alleged that Livingston had harassed him over a debt owed Williams. We cannot find that the district court erred with respect to the sheriff's personal liability.
 
 
 41
 Wright submits that the Sheriff's Department is liable for violations of Sec. 1983 under three theories. First, Wright argues that Sheriff Sheppard delegated his authority under Florida law to establish policy for the department within the community of Avon Park to Livingston. He relies on statements by the district court to the effect that Livingston was "the law" in Avon Park for many years. However, to subject the Sheriff's Department to liability for his deeds, Livingston must have possessed the authority to make final policy. City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion). "[T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." Mandel v. Doe, 888 F.2d 783, 792 (11th Cir.1989) (citing Praprotnik, 485 U.S. at 125-28, 108 S.Ct. at 924-26). Reviewing the district court's dispositive orders as a whole, we can discover no ruling that Livingston bore actual policymaking authority in Avon Park or elsewhere in Highlands County. The statements alluded to by Wright indicate at most that Livingston served as the Department's only visible representative in the community. To the extent that the plaintiff presented this theory to the district court, that court determined that Livingston did not bear authority to establish policy for the Sheriff's Department. We may not upset this determination.
 
 
 42
 Next, Wright says that the Sheriff's Department violated Sec. 1983 by failing to train its officers as to private debt disputes. Before such liability arises, however, the need for such training must be plainly obvious to Department decisionmakers. See City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). As noted above, the district court found that the sheriff had no actual notice of unconstitutional practices by Livingston. Also the court found no evidence of a history of widespread prior abuse by Department personnel that would have put the sheriff on notice of the need for improved training or supervision. Wright failed to prove this theory of departmental liability.
 
 
 43
 Wright's third basis is that the Department ratified Livingston's activities by failing to correct them or to take disciplinary action against Livingston. See Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir.1985). As a factual matter, however, the Department was not aware of any history of prior abuses by Livingston; it can therefore hardly be said to have "persistently failed" to address such abuses. Cf. id. Moreover, Livingston resigned from the Department shortly after an investigation of the incident with Wright commenced. Wright's ratification theory fails under the facts.
 
 V. Conclusion
 
 44
 We AFFIRM the judgment against all plaintiffs save Wright. We also AFFIRM the judgment against Wright relating to his RICO claims and to the liability of Sheriff Sheppard in his personal and official capacities. We VACATE the district court's award of damages to Wright on his battery, false imprisonment, and Sec. 1983 claims against Livingston, and REMAND for further proceedings concerning damages.
 
 
 45
 COX, Circuit Judge, concurring in part and dissenting in part:
 
 
 46
 I concur in the majority opinion except for the part of the opinion that holds that the district court must award punitive damages in this case; as to that part of the opinion, I respectfully dissent. The majority says: "No matter how egregious the defendant's conduct, whether to award punitives is left to the fact finder." The majority then proceeds to conclude that the defendant's conduct in this case is so egregious that the fact finder cannot be allowed to decline to award punitives. I agree that punitive damages are appropriate in this case, but that is not the issue; the issue is whether the trial court is to be reversed for declining to award punitive damages.
 
 
 47
 The Supreme Court has held that punitive damages may be awarded in a section 1983 case if the trier of fact finds that the defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Justice Brennan, writing for the majority in Smith, stated:
 
 
 48
 [W]e are content to adopt the policy judgment of the common law--that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages.
 
 
 49
 Id. at 51, 103 S.Ct. at 1637 (emphasis added). Smith argued, in Smith v. Wade, that the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the standard for liability in the first instance. Rejecting that argument, Justice Brennan stated:
 
 
 50
 This argument incorrectly assumes that, simply because the instructions specified the same threshold of liability for punitive and compensatory damages, the two forms of damages were equally available to the plaintiff. The argument overlooks a key feature of punitive damages--that they are never awarded as of right, no matter how egregious the defendant's conduct. "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury, which may or may not make such an award." D. Dobbs, Law of Remedies 204 (1973) (footnote omitted). Compensatory damages, by contrast, are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss. Hence, it is not entirely accurate to say that punitive and compensatory damages were awarded in this case on the same standard. To make its punitive award, the jury was required to find not only that Smith's conduct met the recklessness threshold (a question of ultimate fact), but also that his conduct merited a punitive award of $5,000 in addition to the compensatory award (a discretionary moral judgment).
 
 
 51
 Id. at 51-52, 103 S.Ct. at 1638 (emphasis added).
 
 
 52
 The Smith Court's statement that punitive damages are "never awarded as of right, no matter how egregious the defendant's conduct" is unremarkable only because courts throughout this country have said the same thing for many, many years. The question is, what do courts mean when they say that punitive damages are never a matter of right. I think it clear that they mean that the fact finder may in all cases decline to award them. The only control generally recognized by appellate courts has been the ability to reduce excessive awards. In Punitive Damages Law and Practice, the authors state
 
 
 53
 due to the universal recognition of the broad discretion of a jury to determine whether to give or withhold punitive damages and when awarded, to determine the amount to be awarded, only one area of judicial control over the discretion has been recognized. This area of judicial control is over excessive punitive damage awards.
 
 
 54
 J. Ghiardi & J. Kircher, 1 Punitive Damages L. & Prac. Sec. 5.39, at 60 (1987). The authors go on to state a jury's refusal to award punitives, once properly instructed on the issue, will not be overturned. Id. Sec. 18.01, at 1.
 
 
 55
 It is also clear, however, that the law in our circuit is to the contrary. Binding precedent in this circuit supports the notion that an appellate court may direct a fact finder to award punitive damages; one former fifth case and one eleventh circuit case so hold. These decisions have, to borrow Judge Godbold's phrase, taken a "journey down the wrong road." I digress briefly to discuss that journey.
 
 
 56
 In Gore v. Turner, 563 F.2d 159 (5th Cir.1977), cited by the majority, the court of appeals directed the district court to award punitive damages. It is in that case that our predecessor circuit discovered for the first time that it possessed the power to direct a fact finder to award punitive damages. The court cited no authority for the proposition that an appellate court can mandate an award of punitive damages, and indeed there was no federal authority to cite. No other court of appeals had ever said that it could reverse a fact finder for declining to award punitive damages. The court did not articulate a standard for deciding when it was reversible error to decline to award punitive damages. It simply said, "Because of the seriousness of the defendant's conduct, this Court directs the district court to award punitive damages to deter the defendant from such conduct in the future." Id. at 164. The court had said earlier in the opinion that an award of punitive damages " 'involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent' to future illegal conduct." Id. (quoting Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (5th Cir.1970)).
 
 
 57
 Our research reveals only one other federal case which supports the rule that an appellate court can mandate a punitive award--H.C. Hewett v. Jarrard, 786 F.2d 1080 (11th Cir.1986). In that case a juvenile detainee brought an action pursuant to 42 U.S.C. Sec. 1983 against, among others, the superintendent of a juvenile detention center in Florida. He sought damages for the imposition of extended isolation without notice and hearing, the conditions of that isolation, unjustified and excessive force applied to him by the superintendent, and the denial of medical care. On appeal, our court held that the trial court erred in awarding only nominal damages and remanded the case to the district court to determine the proper amount of compensatory damages. The court also instructed the district court to award punitive damages on remand, finding that the superintendent's actions "transcended mere negligence and constituted callous indifference to" the detainee's federally guaranteed rights. Id. at 1089. This finding did no more than trigger consideration of punitive damages. Without further discussion or analysis, however, the court told the district court to award punitive damages on remand because the court concluded that the facts "establish compensable injury and conduct sufficiently egregious to warrant punitive damages." Id.
 
 
 58
 The holdings in Gore and Jarrard that an appellate court can require a fact finder to award punitive damages are wrong. The Supreme Court's discussion of punitive damages in Smith v. Wade demonstrates that these decisions are wrong. Punitive damages are never a matter of right and the fact finder may in any case decline to award them. See 25 C.J.S., Damages Sec. 117(2) (1966); 22 Am.Jur.2d, Damages Sec. 739 (1988); Restatement (Second) of Torts Sec. 908, Comment d (1979); J. Ghiardi & J. Kircher, 1 Punitive Damages L. & Prac., Sec. 5.39 (1987); L. Schlueter & K. Redden, Punitive Damages Sec. 6.2 (2d ed. 1989); Merrit v. DeLos Santos, 721 F.2d 598 (7th Cir.1983) (trial courts cannot be required to award punitive damages).
 
 
 59
 Nevertheless, we are bound by the contrary precedent in our circuit. That precedent deserves fresh consideration by our court en banc. In the meantime, however, we must decide by what standard we are to determine when fact finders shall be required to award punitive damages.[1]
 
 
 60
 Wright's argument on this appeal does not help us decide what standard is to be applied. He argues simply that Livingston's conduct constituted "callous indifference" to federally guaranteed rights and, therefore, he was entitled to an award of punitive damages. The one page in Wright's brief devoted to this subject does not explain why meeting this threshold does more than trigger consideration of the appropriateness of punitive damages.
 
 
 61
 Our previous decisions do not articulate a meaningful standard. The Gore court mandated an award of punitives because of the "seriousness" of the defendant's conduct. Clearly, this is a standard without meaning. I cannot imagine conduct that is found to constitute an intentional violation of federal law or that demonstrates reckless or callous disregard of federally protected rights that is not "serious." Indeed, the Supreme Court instructs us that a finding of this sort of conduct does no more than trigger a consideration of punitive damages. The Jarrard court did not articulate any standard at all for determining when punitive damages must be awarded. The majority implicitly recognizes the emptiness of the "standards" applied by the Gore and Jarrard courts and chooses to create its own standard to be applied in cases like this one. The standard the majority chooses is abuse of discretion.
 
 
 62
 Assuming that the standard is abuse of discretion, I cannot conclude that an abuse of discretion has been demonstrated in this case. After concluding that Livingston acted with callous or reckless indifference to Wright's federally protected rights, the majority proceeds to resolve factual inquiries which should be resolved by the fact finder. The fact finder must balance the punishment and deterrent value of punitive damages with the nature of the conduct and the compensation already awarded. The majority concludes that this case "cries out" for punitive damages as punishment, and that punitive damages will deter both Livingston, if he is now engaged or hopes to again engage in law enforcement, and other law enforcement officers. The problem is that the propriety of awarding punitive damages for punishment and for deterrence are not questions of law, but fact-sensitive inquiries for the fact finder. Having concluded that the threshold for consideration of such damages has been met, however, our court proceeds to the factual inquiries, and in doing so usurps the prerogative of the fact finder.
 
 
 63
 A reasonable fact finder could conclude that it is not necessary to award punitives in this case to serve the purposes of punishment and deterrence.[2] Livingston was a deputy sheriff in a small Florida county. In addition to compensatory damages, the amount of which is yet to be determined, attorneys' fees will be awarded. While fees are not awarded to punish, and while Livingston's income may be legally irrelevant, it is difficult to ignore the fact that the award of attorneys' fees alone will probably exceed what Livingston earned in a year as a Florida Deputy Sheriff. A reasonable fact finder could conclude that an award of punitive damages to serve the purpose of punishing Livingston is not required. As for deterrence, there is no evidence in this case that Livingston will ever again work in law enforcement. There is also no evidence that other law enforcement officers have engaged in similar conduct. I fail to understand how the majority concludes that no reasonable fact finder could find it unnecessary to impose punitive damages in this case for deterrence purposes.
 
 
 64
 Punitive damages are "not favored in law," Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (1970), appeal after remand, 444 F.2d 143 (5th Cir.1971). Many in the legal community today are concerned about excessive awards by juries. I find the prospect of appellate courts exercising the awesome power to mandate the award of punitive damages even more alarming, particularly if appellate courts can answer factual inquiries with no deference to fact finders.
 
 
 
 [1]
 Three other plaintiffs complained of separate incidents allegedly involving Livingston and relating to debts they owed money-lenders. The court ruled that those plaintiffs had failed to carry their burden of proof
 
 
 [2]
 THIS CAUSE is before the Court on Affidavits and other Proofs by PLAINTIFF, IVORY WRIGHT (WRIGHT), regarding damages in this cause
 Upon consideration of the record in this cause, the Court notes that, by Order of December 5, 1988, this Court found DEFENDANT, CROBMOND LIVINGSTON (LIVINGSTON), liable to PLAINTIFF for battery and false imprisonment. PLAINTIFF has filed a copy of a dentist's bill in the amount of five hundred sixty-nine dollars and no cents ($569.00). PLAINTIFF has also filed his own affidavit regarding PLAINTIFF's physical and emotional conditional (sic) since the battery and false imprisonment, as well as a statement from a Psychologist regarding PLAINTIFF's emotional state and the suggested treatment for PLAINTIFF in the future.
 The Court has no problems with the dentist's bill. However, with respect to the other alleged elements of PLAINTIFF's damages, the Court has great problems. As stated by the Psychologist, "Some time after the beating (of PLAINTIFF by LIVINGSTON), Mr. Wright suffered a stroke. The proximity of the stroke to the beating is unknown. The condition of Mr. Wright's health prior to the time he had the stroke and prior to the beating, is also unknown." Dkt. 67.
 Put even stronger, and in legal terms, there was no evidence adduced at trial, nor submitted later by Affidavit, that PLAINTIFF's stroke was in any way related to the battery. Further, there was no evidence adduced at trial, nor submitted later by Affidavit, regarding PLAINTIFF's physical and emotional health prior to the battery. Assuming that PLAINTIFF is in need of physical and/or emotional therapy, there is simply no evidence before the Court that the costs of said therapy should be taxed against LIVINGSTON. To assess said costs against LIVINGSTON would involve pure speculation on the Court's part.
 WHEREFORE, and for the reasons stated, it is
 ORDERED AND ADJUDGED that DEFENDANT, LIVINGSTON, shall pay to PLAINTIFF, IVORY WRIGHT, the sum of five hundred sixty-nine dollars and no cents ($569.00) as damages in this cause.
 
 
 [3]
 On credibility and physical evidence grounds, the district court rejected Wright's testimony that Livingston had driven him to an orange grove and had beaten him there
 
 
 [4]
 In Holmes v. J. Ray McDermott, 734 F.2d 1110 (5th Cir.1984), the defendant challenged findings of fact concerning its conduct and challenged as excessive punitives awarded because of that conduct. The Fifth Circuit affirmed the findings of fact then reviewed the amount of punitives and found them not excessive. If trial court decisions concerning punitive damages were unreviewable, the second step would have been inappropriate
 
 
 [5]
 The brief filed with this court in the name of "Appellee Sheppard" refers to him as "the late Sheriff Joe Sheppard." A similar reference was made at oral argument. No motion for substitution of a party or to dismiss the action against Sheriff Sheppard has been made in this court pursuant to Fed.R.Civ.P. 25. In view of our conclusion that the district court did not err with respect to claims against Sheriff Sheppard we have not pursued the matter of substitution or dismissal
 
 
 [1]
 This standard should also determine when a jury is to be instructed that it must award such damages, because surely the right to such damages does not depend upon whether the trial was a jury trial or a bench trial. In Smith the Supreme Court noted that the jury had been instructed in a way that recognized the difference in the way the law treats compensatory damages and punitive damages; the jury had been instructed that if they found for the plaintiff they must award compensatory damages and that the law permits, under certain circumstances, an award of punitive damages. 461 U.S. at 52, 103 S.Ct. at 1638, n. 15
 
 
 [2]
 Wright's brief on this appeal does not argue that an award of punitives is necessary for punishment or deterrence; the majority nevertheless concludes that punitives must be awarded for those purposes